### IGNACIO MUNOZ V. THE STATE.

No. 10792.   Delivered February 23, 1927.

**Assault to Rape—Child as Witness—Held Not Qualified.**

Where, upon a trial for an assault to rape, alleged to have been committed upon a young child, it appearing upon her examination that the prosecutrix did not have any sort of a conception of the character of an oath, and did not know that it was wrong to tell a falsehood, her testimony being of a very indefinite character and not being supported in the slightest degree by any other witness, the cause must be reversed and remanded.

Appeal from the District Court of Irion County.   Tried below before the Hon. J. F. Sutton, Judge.

Appeal from a conviction of an assault with the intent to rape, penalty two years in the penitentiary.

The opinion states the case.

*Anderson & Mobley* of San Angelo, for appellant.   On competency of a child as witness appellant cites:   Williams v. State, 12 Tex. Crim. App. 127; Holst v. State, 23 Tex. Crim. App. 1; Anderson v. State, 88 Tex. Crim. Rep. 307.

*Sam D. Stinson,* State's Attorney, and *Robert M. Lyles,* Assistant State's Attorney, for the State.

LATTIMORE, Judge.—Conviction for assault to rape, punishment two years in the penitentiary.

Appellant appears from the record to be a young Mexican who was working for the father of prosecutrix.   The latter was a girl about twelve years of age.   Much of the statement of facts appears in question and answer form, it being certified by the learned trial court that he deemed it impossible to have said statement of facts reduced to narrative form, and that he had it put in in this condition in order that we might appraise the testimony as given.

Serious question was, and is here, raised as to whether there is sufficient proof that prosecutrix understood the nature and character of an oath, and objection was made to her testimony upon that ground.   We set out the testimony appearing to shed light on this issue.   Prosecutrix was asked if she knew what happens to little girls who did not tell the truth, and made no answer.   She was asked if she knew what would happen to her if she would tell something that was not true; if she knew what it was to take an oath; if she had ever taken an oath before,

and replied "no." She was asked by the District Attorney if it was right to tell the truth or wrong to tell a story, and apparently made no answer. She was asked each of these questions, viz.: "Is it right to tell the truth? Is it wrong to tell a story?" and made no answer. She was asked by appellant's counsel if she knew what it meant to take an oath to tell the truth, the whole truth and nothing but the truth, and that if she knew, to so state. In this connection he said to her: "We are all your friends and do not want to embarrass you." She made no answer to any of these questions. She was asked if she went to Sunday school, and she said "no." Asked if she had ever been to preaching, she said one time. Asked how long had it been, she said she did not know. Asked if she ever had anyone tell her what it means to swear falsely, she made no reply. Asked if she ever studied her Sunday school lesson, she said "no." Asked if she ever read the Bible, she said "no." Asked if she knew anything about funny papers, she answered "no." Asked to tell the court if she knew what it meant to take an oath, she made no answer. The jury seems to have been out during this examination. The District Attorney asked the witness, "If they bring this jury back, you can tell me the answers to the questions I may ask you, can't you? You know it is wrong to tell a story and that it is right to tell the truth?" To this the witness made no reply. Asked by the court if her mother ever told her it was wrong to tell a story, or if her father ever told her that, she said "no." At this juncture the learned trial court observed: "She does not seem to understand the sacredness of an oath; she doesn't seem to know." The appellant's objection to her testifying was overruled.

Recognizing the fact that a young girl might by her answers manifest that she possessed knowledge along this line, we have carefully considered her testimony to ascertain if it indicates that she knew the difference between the right and wrong of telling the truth or its opposite. Practically all of her testimony was in monosyllables or extremely short replies, and the stenographer certifies much of it was by nodding or shaking the head. She said she was fishing on the occasion in question; that she saw appellant. Asked to tell the jury what, if anything, he did, she made no answer. Asked if he came close to her, she said "yes." She said she went to school, had gone to school "two Aprils." Had lived at Mertzon about two Aprils. Asked if she could tell the jury and District Attorney what happened, she nodded her head. Asked again if she knew what happened to little girls who did not tell the truth, she made no answer.

She said she could read and write. When the jury were brought
back into the court room from their retirement while the court
investigated the question of whether she was competent to tes-
tify, the state's counsel was permitted to lead the little girl. He
asked her the following questions: "What did he do, if any-
thing? Go ahead and tell me? Can't you go ahead and tell me?"
to which she answered, "I don't know." The District Attorney
asked, "How close to you was he? Can you show me if I will
stand up?" And at this point counsel stood up. The witness did
not answer the question. Counsel asked, "Did he put his hands
on you anywhere?" to which she said "yes." Counsel asked her
where, and the statement of facts reports as the answer of the
witness (witness indicates by pointing on her person). The Dis-
trict Attorney said to her, "Anywhere else?" and witness said
"Up here" (indicating). Counsel asked her as to whether his
hand was under or on top of her clothing. She said "Under."
She further said in monosyllables and in response to questions
that appellant kissed her, that he unbuttoned his pants. At this
point the District Attorney asked, "Did he do anything else?
You say he unbuttoned his pants?" to which the little girl
answered "yes." Counsel then asked, "What did he do?" and
she replied, "Pulled them down." Thereupon the District Attor-
ney asked the following questions: "Did he do anything else?
Tell me if he did? What was it? Can't you tell me?" Go ahead
and tell me if he did anything else? Here is Mr. Harkey (sheriff),
and he is your friend, and these twelve men here are your
friends. Can you tell me if he did anything else? Did he? Did he
have his hands under your clothes or on top?" No answers being
made to any of these questions, defense interposed the objection
that the questions had been asked over and over. The court
overruled the objection, and the District Attorney proceeded.
"Did he do anything then? When he unbuttoned his pants
what did he do? Go ahead and tell us. Can you? Can you
tell us? Don't be frightened. Can you tell me now what he did,
just like you were talking to your father or mother or Mr.
Harkey, or anybody else. Will you? When he unbuttoned his
pants, then what did he do? Will you tell me? Huh? Can't
you say what he did?" No answers having been given to any
of these questions, appellant's counsel interposed the objection
that the witness had been asked many times and notwithstand-
ing his client was a Mexican, he was entitled to a fair trial and
that there should be a limit in an effort to extract statements
in favor of the state in response to constant leading qeustions.
The court overruled the objection. The District Attorney pro-

ceeded to ask her: "Don't tell anything but the truth. Now, when the Mexican unbuttoned his pants, did he do anything else? Did he unbutton his pants here? (indicating), and she replied "yes." The District Attorney then said, "Then what did he do with reference to himself here, if anything? Can you tell me? Go ahead and tell me if he did anything? Did he take any part of his person out of his pants?" Objection was interposed at this time, which was overruled by the court, and the District Attorney proceeded: "Did he take any part of his person out of his pants? If he took any part of his person out of his pants, what did he do with that part of his person?" to which she replied, "Put it in the hole." The District Attorney then asked her, "Did that cause you any pain? Did it hurt you or not?" to which she made no answer.

We have carefully examined the entire record and are impressed with the utter absence of any showing that this child had any sort of conception of the nature or character of an oath, or that it was wrong to tell a falsehood and right to tell the truth. No amount of interrogation seemed to be able to elicit from her any statement indicating this fact. No other witness testified to having seen any part of the transaction or in any wise supporting the testimony, if any, given by the child. The mother of the girl testified that appellant was in the kitchen washing dishes when prosecutrix told her of what had taken place. She told her husband, who went in and accused the Mexican boy of doing something, and when appellant denied doing anything, the father of prosecutrix threw a butcher knife at him, and appellant ran away. The woman testified that it was about fifty yards from her house to the creek where the alleged assault should have taken place. Appellant testified denying that he had put his hands on the little girl or done anything to her at all. Neither the mother nor any other person testified to any sort of examination of the person of prosecutrix, or that there was any excitement in her manner when she came to the house from the creek, or to any corroborative fact supporting her story. The child's mother was put on the stand and said that she had had prosecutrix brought home from school because the children teased and worried her and she got nervous. Some times when they teased her prosecutrix would become agitated and was excitable and "runs a high fever." A woman who was living in a tent not far from where the occurrence is supposed to have taken place said prosecutrix came to her tent and was excited in talking about the Mexican. She does not attempt to detail any statement made by the child to

her, although the supposition would be it was immediately following the occurrence, if such there was. We deem it far too serious a matter to take away the liberty of a citizen, even though he be an ignorant and unknown Mexican, and incarcerate him in the penitentiary upon the testimony of a child who seems to display an entire ignorance concerning the moral responsibility involved in giving testimony.

The judgment will be reversed and the cause remanded.

*Reversed and remanded.*